Josephine B. **HUDDELL**, Administratrix ad prosequendum and General Administratrix of the Estate of Benjamin R. Huddell, Deceased and Josephine B. Huddell, Individually, Plaintiff,

v.

George Gerson **LEVIN** et al., Defendants.

Civ. No. 769–70.

United States District Court, D. New Jersey.

Feb. 25, 1975.

Supplemental Opinion May 28, 1975.

James E. Beasley, Beasley, Hewson, Casey, Kraft & Colleran, Philadelphia, Pa., and John R. Bennie, Bennie & Sarubbi, Camden, N. J., for plaintiff.

Arthur Montano, Kisselman, Deighan, Montano & Summers, Camden, N. J., for defendant, Levin.

Francis E. Marshall, Marshall, Dennehey & Warner, Philadelphia, Pa., and G. Paul Crawshaw, Martin & Crawshaw, Haddonfield, N. J., for defendant, S. Klein.

John C. Heavey, Jr., Carpenter, Bennett & Morrissey, Newark, N. J., for defendant, General Motors.

## OPINION

### UPON POST-TRIAL MOTIONS

COHEN, Senior District Judge:

Numerous post-trial motions are here presented, in this negligence and product liability action, following the return of a jury verdict of $2,024,710 in favor of the plaintiff and against the defendant, General Motors. A resume of the testimony adduced throughout the four-week trial is appropriate.

On the early morning of March 24, 1970, a clear, dry day, Dr. Benjamin R. Huddell, a psychiatrist, was en route from his home in Cherry Hill, New Jersey, to the Delaware State Hospital, where he was engaged in psychiatric research. Dr. Huddell was operating a 1970 Chevrolet Nova, manufactured by General Motors and purchased from its dealer approximately four months prior to the accident. Installed as part of its original equipment were head restraints for driver and front-seat passenger, each at a retail cost of $30.00, whose sole purpose was to prevent rearward rotation of the head and neck in the event of a rear-end collision. Evidence was presented that these head restraints were designed in such a manner as to expose the rear of the head to a relatively sharp, unyielding metal edge, covered by two inches of soft, foam-like material.

Dr. Huddell's car ran out of gas on the Delaware Memorial Bridge, connecting the States of New Jersey and Delaware. His car was brought to a full stop in the left-most, southbound lane of traffic; he was seat-belted in the driver's seat; and the blinker lights on his vehicle were in operation. At approximately 8:30 A.M., the defendant, George Gerson Levin, in the course of his employment for the defendant, S. Klein Department Stores, Inc., and en route to S. Klein's branch store in Greenbelt, Maryland, drove his Chrysler sedan at a considerable rate of speed directly into the rear of Dr. Huddell's Nova. Levin's speed was estimated at fifty miles per hour (Levin) and sixty miles per hour (plaintiff's expert). Because of the energy-absorbing characteristics of the vehicles and friction with the roadway, the impact resulted in an acceleration of the Huddell automobile to a maximum speed of 31.7 miles per hour. The rear of Dr. Huddell's head struck the head restraint at a speed of ten miles per hour.

Levin sustained only superficial injuries for which he was examined, treated and discharged from the hospital within an hour after the accident. With the exception of his head, Dr. Huddell also sustained superficial in-

juries; the autopsy performed by the Chief Medical Examiner of the State of Delaware, within two and a half hours after Huddell's death, revealed that his neck, skeletal system and internal organs sustained no injury whatsoever. The blow of his head against the head restraint, however, resulted in "extensive fracture" to the occipital region of the skull. Because of a medical phenomenon known as "contrecoup," by which the brain of a moving head striking a stationary object sustains injury opposite the point of impact, the frontal portions of Dr. Huddell's brain were extensively damaged, as a result of which he died one day after the accident.

Dr. Huddell had just completed a residency at the Jefferson Medical College in psychiatry and had opened a private office for the practice of his specialty. At the time of his death he was thirty-nine years of age; his wife Josephine was thirty-four; the range of age of his five children was from three to thirteen years.

Suit was instituted in this court, based upon diversity of citizenship, by Mrs. Huddell in her representative capacity, against George Gerson Levin, driver of the rear-ending vehicle, alleging negligence, against Levin's employer, S. Klein Department Stores, on a *respondeat superior* theory, and against General Motors Corporation, charging that the head restraint installed in Dr. Huddell's vehicle was defectively designed, unreasonably dangerous and failed to give him proper protection against a rear-end collision such as heretofore described.

Upon conclusion of the trial, after considerable discussion with counsel in chambers, accord was reached that the following special interrogatories be submitted to the jury:

1. Was the defendant, George Gerson Levin, negligent in the operation of his automobile?

2. If you have answered "Yes," was the negligence of George Gerson Levin a substantial contributing factor or proximate cause of the death of Dr. Huddell?

3. Was George Gerson Levin in the scope of his employment with the defendant S. Klein Department Stores, Inc. at the time of the accident?

4. Was Dr. Huddell contributorily negligent in the operation of his automobile?

5. If your answer to Interrogatory No. 4 is "Yes," was Dr. Huddell's contributory negligence a substantial contributing factor or proximate cause of the accident?

6. Did Dr. Huddell's head strike the head restraint?

7. Was the head restraint in the 1970 Chevrolet Nova of Dr. Huddell defective and unreasonably dangerous?

8. If your answer to Interrogatory No. 7 is "Yes," was the head restraint a substantial contributing factor or proximate cause of the death of Dr. Huddell?

9. Did General Motors breach its warranty for fitness for the particular purpose for which the headrest was designed, at the time of the accident of March 24, 1970?

10. If your answer to Interrogatory No. 9 is "Yes," was such breach of warranty a substantial contributing factor or proximate cause of Dr. Huddell's death?

11. If you find that the plaintiff, Mrs. Huddell, is entitled to recover against any or all defendants, what is the amount of your verdict?

The jury returned its answers, finding in substance, that Levin was negligent and was acting within the scope of his employment for S. Klein, but that his negligence was not a substantial contributing factor or proximate cause of Dr. Huddell's death; that Dr. Huddell

was not contributorily negligent; that Dr. Huddell's head did strike the head restraint; that the head restraint was defective and unreasonably dangerous and was a substantial contributing factor of Dr. Huddell's death; that General Motors breached its warranty of fitness which breach was a substantial contributing factor of Dr. Huddell's death; and that the damages sustained were $2,024,700.00.

In accordance with the jury's special findings of fact, judgment was entered in favor of the plaintiff against General Motors in the amount of the jury's verdict, together with prejudgment interest under New Jersey law. Judgments of no cause for action were entered in favor of Levin and S. Klein.

The post-trial motions may, in the main, be stated as follows:

General Motors asks for Judgment Notwithstanding the Verdict, pursuant to Rule 50(b), Fed.R.Civ.P., or, in the alternative, for a new trial on the issues of its liability, pursuant to Rule 59(b), Fed.R.Civ.P.; plaintiff and General Motors seek judgment *n. o. v.* against Levin and S. Klein, urging that Levin's negligence was, as a matter of law, a proximate cause of plaintiff's damage; General Motors moves for a new trial alleging trial error in the admission of testimony concerning the potential growth of Dr. Huddell's earnings, and in foreclosing the jury's consideration of income tax consequences, thereby resulting in an excessive verdict, in which motion Levin and S. Klein join should the court find them liable as a matter of law; General Motors maintains that no prejudgment interest on plaintiff's claim may be added to the jury's verdict; and General Motors raises objections to the plaintiff's bill of costs. Additionally, General Motors urges that if it is responsible at all, it is so only for enhanced injuries of which an unreasonable design defect was a direct proximate cause.

Because the accident, the decedent's survivors and the trial were all in New Jersey, all parties agree that New Jersey law must govern these and all other issues raised post-trial.

Inasmuch as Levin and S. Klein do not here challenge the jury's findings concerning negligence and *respondeat superior*, the relevant factual disputes revolve around the alleged defect of Dr. Huddell's vehicle and the cause of his death. Of course, all testimony and inferences therefrom on these issues must be viewed in a light most favorable to the respective jury-verdict winners.

The foregoing motions will be considered *seriatim*:

## I. GENERAL MOTORS' MOTION FOR JUDGMENT N.O.V. IN ITS FAVOR

General Motors does not challenge the basis for the findings of fact set forth above. Rather, in support of the captioned motion, it urges that "second collision" liability is not the law of New Jersey; that it compliance with applicable federal standards forecloses the assessment of common law liability; and that, in any event, it had no legal duty to foresee that its head restraint would be used in the manner that it was.

██ Furthermore, General Motors now suggests that plaintiff's proofs were insufficient to permit a jury finding that Dr. Huddell's death was a result of the defectively designed headrest, as opposed to other possible causes set in motion by the rear-end impact. To the contrary, the evidence convincingly supported the jury's finding. In any event, because this ground was not raised in its motion for a directed verdict, General Motors is now precluded from asserting it as a basis for the entry of judgment *n. o. v.*, Budge Mfg. Co. v. United States, 280 F.2d 414 (3rd Cir. 1960).

General Motors' broad attack is based upon the split of authority over whether automobile manufacturers can be held liable for defects in their cars which, although playing no part in the

initial collision, cause increased injuries to occupants. Illustrative of this conflict are Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966) and Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968).[1] In *Evans*, plaintiff alleged that if the frame of his car had been designed differently he would have sustained lesser injuries following a broad-side collision. The majority opinion, for a divided court, reasoned from the truism that a "manufacturer is not under a duty to make his automobile accident-proof or fool-proof," 359 F.2d at 824; that the manufacturer therefore had no duty to make his automobile "crashworthy." The decision turned solely on the majority's determination of "intended use":

> "The intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur. As defendant argues, the defendant also knows that its automobiles may be driven into bodies of water, but it is not suggested that defendant has a duty to equip them with pontoons." *Id.*

The reasoning of *Evans* is not without its adherents.[2]

The rationale of *Evans*, however, has been rejected by the majority of jurisdictions and has met with uniform criticism by commentators.[3] The genesis of much of this current thought was Larsen v. General Motors Corp., *supra*. There, plaintiff alleged that death, following a head-on collision, was caused by the failure of the steering column to collapse. Rejecting the notion that accidents are not readily foreseeable,[4] the court held that a manufacturer could not close his eyes to this eventuality:

> "We think the 'intended use' construction urged by General Motors is much too narrow and unrealistic. . . . While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called 'second collision' of the passenger with the interior part of the automobile, all are foreseeable.
>
> . . . The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art." 391 F.2d at 502.

A majority of jurisdictions, considering the "intended use" issue presented by enhanced injury cases, has followed the *Larsen* analysis.[5]

---

1. Both cases were decided under applicable state law, which limited recovery to proof of negligence. Thus, while each case dealt with the manufacturer's duty, the language of each was framed in terms of reasonable care, rather than concepts of strict liability.

2. *E. g.*, Schemel v. General Motors Corp., 384 F.2d 802 (7th Cir. 1967); McClung v. Ford Motor Co., 472 F.2d 240 (4th Cir. 1973) (2–1 decision); Shumard v. General Motors Corp., 270 F.Supp. 311 (S.D.Ohio 1967); Willis v. Chrysler Corp., 264 F.Supp. 1010 (S.D.Texas 1967).

3. *See* Dyson v. General Motors Corp., 298 F. Supp. 1064, 1067 n. 4 (E.D.Pa.1969).

4. The Eighth Circuit noted that between one-fourth and two-thirds of all automobiles are involved in injury-producing accidents during their useful lives, and that some two million disabling injuries are sustained yearly in automobile accidents. *Larsen*, 391 F.2d at 502.

5. *E. g.*, Perez v. Ford Motor Co., 497 F.2d 82 (5th Cir. 1974); Turcotte v. Ford Motor Co., 494 F.2d 173, 180–82 (1st Cir. 1974); Green v. Volkswagen of America, Inc., 485 F.2d 430 (6th Cir. 1973); Passwaters v. General Motors Corp., 454 F.2d 1270 (8th Cir. 1972); Marshall v. Ford Motor Co., 446 F.2d 712 (10th Cir. 1971); Richman v. General Motors Corp., 437 F.2d 196, 199 n. 5 (1st Cir. 1971); Bremier v. Volkswagen of America,

■ The issue for decision, however, is not what this court believes to be the preferable rule, but rather what rule the New Jersey Supreme Court would adopt. Costello v. Schmidlin, 404 F.2d 87, 91 (3rd Cir. 1968). This determination must be based upon "all that is known about its methods of reaching decisions." C. Wright, Law of Federal Courts, § 58 at 240 (2d ed. 1970).

Our inquiry must begin with a decision that catapulted New Jersey into the forefront of jurisdictions providing consumer protection through strict liability, Henningsen v. Bloomfield Motors Inc., 32 N.J. 358, 161 A.2d 69 (1960), where the court extended warranty protection to innocent third-parties. Noting that automotive speeds of 60 miles per hour are permissible, the court held:

> "In a society such as ours, where the automobile is a common and necessary adjunct of daily life, and where its use is so fraught with danger to the driver, passengers and the public, the manufacturer is under a special obligation in connection with the construction, promotion and sale of his cars." 32 N.J. at 387, 161 A.2d at 85.

The warranty theory was soon extended to strict liability in tort, even before the adoption of Section 402A by the American Law Institute. Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965); Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 63–67, 207 A.2d 305, 311–13 (1965). In subsequent cases, the court extended its rule to all defects which "proximately resulted in the damage." Rosenau v. City of New Brunswick, 51 N.J. 130, 140, 238 A.2d 169,

176 (1968); *accord,* Scanlon v. General Motors Corp., 65 N.J. 582, 590, 326 A.2d 673, 677 (1974); *see* Newmark v. Gimbels, Inc., 54 N.J. 585, 258 A.2d 697 (1969) (defendant has burden of proving allergic reaction to hair setting lotion); Sabloff v. Yamaha Motor Co., 113 N.J.Super. 279, 273 A.2d 606 (App.Div.), aff'd, 59 N.J. 365, 283 A.2d 321 (1971) (inference of defect arising from malfunction).

New Jersey appellate courts have considered the issue of foreseeability, as it would apply to the "intended use" doctrine of *Evans* and *Larsen.* In Lamendola v. Mizell, 115 N.J.Super. 514, 280 A.2d 241 (App.Div.1971), the court faced the issue whether New Jersey's position "in the vanguard of products liability" would permit recovery to a bystander injured when an automobile went out of control. The court gave scant weight to defendant's contention that it owed no duty because such mishaps were unforeseeable:

> " . . . [T]he limitations inherent in the concept of foreseeability, insofar as it applies to legal responsibility and the facts of the instant case, offer no salve for defendants' wounds. An automobile manufacturer, producing millions of vehicles a year, offers them for sale to the public ultimately for daily use on the countless thoroughfares of this nation. It is, therefore, well within the realm of foreseeability that a pedestrian or other traveller lawfully upon the road will be injured due to a defect in a vehicle that in some way inhibits or forecloses its control by the driver." 115 N.J.Super. at 524, 280 A.2d at 246.

Inc., 340 F.Supp. 949 (D.D.C.1972); Grundmanis v. British Motor Corp., 308 F.Supp. 303 (E.D.Wis.1970); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969); Culpepper v. Volkswagen of America, Inc., 33 Cal.App.3d 510, 109 Cal.Rptr. 110 (1973); Evancho v. Thiel, 297 So.2d 40 (Fla.App. 1974); Friend v. General Motors Corp., 118 Ga.App. 763, 165 S.E.2d 734 (1968); Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737 (1974); Brandenburger v.

Toyota Motor Sales, U.S.A., Inc., 513 P.2d 268 (Mont.1973); Bolm v. Triumph Corp., 33 N.Y.2d 151, 350 N.Y.S.2d 644, 305 N.E.2d 769 (1973); Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173 (1969); Engberg v. Ford Motor Co., 205 N.W.2d 104 (S.D.1973); Ellithorpe v. Ford Motor Co., 503 S.W.2d 516 (Tenn.1973); Baumgardner v. American Motors Corp., 83 Wash.2d 751, 522 P.2d 829 (1974); *see* Friedrich v. Anderson, 191 Neb. 724, 217 N.W.2d 831 (1974).

Similarly, in Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972), the manufacturer's contention that it could not foresee use of its product without safety devices, customarily installed by the purchaser, was rejected:

"Where a manufacturer places into the channels of trade a finished product . . . which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser." 60 N.J. at 410, 290 A.2d at 285.

This holding was followed in Finnegan v. Havir Manufacturing Corp., 60 N.J. 413, 423, 290 A.2d 286, 292 (1972), where the court specifically refused to accept any inference contained in the Restatement of Torts that a manufacturer could avoid liability by relying on the expected use of his product by the purchaser.

■■ This court is of the view that the New Jersey Supreme Court would not abandon its vanguard position by holding that manufacturers of automobiles can avoid liability where defects in their products increase injuries, merely

because "haphazard conduct" results in an "unexpected" accident.[6] The manufacturer knows that accidents will occur, and that forces will be exerted upon the occupants of its products. It, therefore, has the duty to provide such passenger protection as is feasible.[7]

■ In this case, however, the decision need not be based on the broad theories of "second collision" case law. The conflict between Evans and Larsen was grounded upon their differing views of whether an accident is part of the "intended use" of the automobile as a whole. Significantly, both courts cited Ford Motor Co. v. Zahn, 265 F.2d 729 (8th Cir. 1959), where plaintiff was injured by a defectively jagged ashtray within the passenger compartment; the Evans court, 359 F.2d at 825, noted that the Zahn instrumentality was thus "unfit for [its] intended use and in precisely that respect [was] the cause of accidental injuries." [8] Here, the only "intended use" of the head restraint was to provide occupant protection in the event of rear-end collisions; it was installed in the car solely because the rearward motion of the head was a foreseeable and predictable incident of travel.

It would be illogical to hold, as General Motors suggests, that a manufacturer has no duty to provide a non-defective head restraint because its "intended use" does not contemplate passenger movement after forceful accidents. On this issue, a unanimous New Jersey Supreme Court has spoken. In Devaney v. Sarno, 125 N.J.Super. 414, 311 A.2d 208 (App.Div.1973), the plaintiff alleged

6. New Jersey appellate courts, in products liability cases, have consistently given great weight to the decisions of California, a jurisdiction that has embraced the "second collision" theory of liability.

7. The court is not unaware of the opinions of four New Jersey trial judges, two federal and two state, to the contrary, three of which are not officially reported and none of which has been considered on appeal. Bearing in mind the significance of New Jersey's vanguard position, as well as the implications of the reported decisions in Lamendola, Bexiga

and Finnegan, supra (see also Yetter v. Rajeski, 364 F.Supp. 105 (D.N.J.1973)), this Court with all due deference to the four aforementioned decisions, finds itself in disagreement with the same.

8. In Zahn, plaintiff leaned down to pick up a cigarette and was propelled into the ashtray by sudden braking necessitated to avoid a collision. The Evans distinction appears to be, therefore, not that the ashtray was "used" in connection with sudden braking, but that its presence in the car had nothing to do with the mechanical operation of the vehicle.

that his injuries were increased by the failure of his seat belt to properly function. The Appellate Division reversed dismissal of the complaint, holding:

"[The car manufacturer] did not install the seat belt to avoid a car accident—this was done to avoid or lessen serious injuries to the driver or passenger which might result from an accident. Thus there had to be an accident before the effect of the defective product came into play." 125 N.J.Super. at 419, 311 A.2d at 210.

The Supreme Court affirmed, 65 N.J. 235, 323 A.2d 449 (1974); accord, e. g., May v. Portland Jeep, Inc., 265 Or. 307, 509 P.2d 24, 27 (1973) (collapse of rollbar); see Baumgardner v. American Motors Corp., 83 Wash.2d 751, 522 P.2d 829 (1974) (seat belt failure); Engberg v. Ford Motor Co., 205 N.W.2d 104 (S.D.1972) (same).

■ General Motors' second contention, that its compliance with federal safety regulations precludes common law liability, is directly at odds with the statutory recognition of such liability. 15 U.S.C. § 1397(c); Larsen, 391 F.2d at 506; see Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 670 n. 13 (6th Cir. 1972). In any event, it was established through General Motors' own experts that the sole purpose of the head restraint regulations was to prevent rearward rotation of the head; because the federal regulations did not consider potential injury to the head (as opposed to whiplash injury to the neck), a suspended machete blade would have met all applicable federal standards, as did defendant's defective head restraint. Thus, there were no federal standards whose purpose was to prevent head injuries such as were sustained by Dr. Huddell. The only standard dealing with injury to the rear of the head was promulgated by the Society of Automotive Engineers, which required an impact area ten times greater than that afforded by Dr. Huddell's head restraint.

■ Finally, General Motors contends that the assessment of liability in this case would require it to produce a "tanklike" vehicle. Under New Jersey law, the test of a defect is "reasonableness," not "perfection," Schipper v. Levitt, 44 N.J. at 92, 207 A.2d at 326; "reasonably suitable" is all that is required, within the limits of feasibility. Santor v. A & M Karagheusian, 44 N.J. at 58, 207 A.2d at 311; Bexiga v. Havir Mfg. Corp., supra. Correction of the defect in this case was neither unfeasible nor prohibitively expensive; a properly designed head restraint, providing greater impact surface and deformable material, could have been made for less than the cost of the Nova head restraint. Inasmuch as General Motors' own expert testified that rear-end collisions constitute some seventeen per cent of all accidents, and impacts at speeds greater than fifty miles per hour may constitute as much as 9 per cent of those accidents, General Motors' duty to provide reasonable protection was clear.

Plaintiff's claim against General Motors, in which defendants Levin and S. Klein joined, was based upon two well-recognized principles of medical and physical fact: the human body's ability to withstand forces exerted upon it depends upon (1) the relative concentration of those forces against any particular area, and (2) the rapidity of acceleration (or deceleration). Thus, a soldier, falling 1200 feet without a parachute, sustained only minor injuries because the forces of his fall were distributed over his entire back in a four-foot cushion of snow; conversely, an individual falling backward on a sidewalk could easily die. Uncontradicted tests in the automotive industry by General Motors' consultants and others demonstrated, long before the production of the 1970 Nova, that the skull could sustain head impact speeds of up to forty miles per hour without injury, if the contact area was of generous radius and constructed of easily deformable material; indeed, the federal standards applying to frontal

impact of the head (there is none applying to rearward impact) require surfaces yielding no injury with a fifteen mile per hour head impact speed.

Plaintiff's testimony amply demonstrated that the head restraint was defective in that it violated both these principles of survival. Because the soft foam provided little protection, a rearward motion of the head would bring it into contact with the sharp "ax-like" metal edge of the head restraint, which concentrated all forces against a one-half inch area of the skull; the metal edge itself was not easily deformable, so that there was no "cushioning" effect.

Plaintiff's experts testified unequivocally that if the head restraint had been designed to take these principles into account, Dr. Huddell would have survived the accident. Other manufacturers had incorporated these principles into their head restraints, at little or no extra cost. General Motors presented little testimony contradicting these opinions, choosing to rest its defense mainly on the theory that Dr. Huddell's head struck the "header" above the rear window, and did not at all contact the head restraint located inches behind him. By answer to a special interrogatory, the jury specifically rejected this contention.

The testimony substantially supported the jury's finding that the head restraint was in a defective condition, unreasonably dangerous to Dr. Huddell, and that this defect caused his death. These findings, together with the jury's finding of breach of warranty, cannot be disturbed by this court.

General Motors' Motion for Judgment N. O. V. is denied.

## II. GENERAL MOTORS' MOTION FOR A NEW TRIAL

Alternatively, General Motors moves for a new trial, presenting three grounds. First, it is contended that the jury's finding that Levin's negligence was not a proximate cause of Dr. Huddell's death was "inconsistent." To the contrary, this finding was not factually inconsistent as to General Motors. Plaintiff's proof was that the death was not caused by the impact of the Levin vehicle with the rear of Dr. Huddell's vehicle, but by the resulting impact of Dr. Huddell's head with the head restraint. The jury's finding that this second impact caused the death was logical, as was its conclusion that had the head restraint not been defective, Levin's negligence would not have led to Dr. Huddell's death. Whether the jury's finding is *legally* supportable is an issue that will be considered below.

Second, it is contended that the court was required to reject New Jersey's adoption of strict liability in tort, and charge exclusively on the negligence concepts incorporated in *Larsen*. This contention is without merit. *Larsen* establishes that a manufacturer has a duty to protect occupants from unreasonable risk of injury following an accident; whether that duty be defined in terms of negligence or strict liability is a matter of state law.[9] This court's charge on liability properly set forth New Jersey standards.[10]

9. The *Larsen* court recognized that "each state [is] free to supplement common law liability for negligence with a doctrine of strict liability for tort as a matter of social policy . . ." 391 F.2d at 503 n. 5.

10. The court charged, in part:
"[T]he duty of a manufacturer is limited to foreseeing the probable result of the normal use of the vehicle or a use which can be reasonably anticipated. He is required to foresee an injury resulting from a defect, which injury occurs during the use of the automobile . . . That is not to say . . . that a manufacturer must produce an accident-proof vehicle which would absolutely protect its occupants against every kind of an accident or contingency. But it must be a vehicle which will protect occupants against accidents which may be reasonably foreseen or anticipated so as to avoid subjecting an occupant to an unreasonable risk of injury in the event of a collision."

General Motors also contends that the court erred in charging that, while the plaintiff had the burden of proving that the defective head restraint was a proximate cause of Dr. Huddell's death, she did not have the burden to prove "to a certainty that Dr. Huddell would have survived had the head restraint not been defective." Taken in context with the whole charge, this is a correct statement of the law. Schuler v. Berger, 395 F.2d 212, 213 (3rd Cir. 1968); Hicks v. United States, 368 F.2d 626, 632 (4th Cir. 1966).

Finally, in concert with its first and third contentions, General Motors contended in its brief and at oral argument that the court failed to allow the jury to apportion damages between those caused by the initial impact, and those caused by the defective head restraint; in other words, that the responsibility of General Motors, if any, is only for those enhanced injuries of which an unreasonable design defect was a proximate cause. General Motors maintains that if the court properly accepted the *Larsen* "second collision" rationale, it was also obligated to follow the "enhanced injury" rule set forth therein:

> "Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design."

Larsen v. General Motors Corp., 391 F.2d at 503.

For example, in a suit alleging blindness as a result of impact with a defectively protruding radio knob, the manufacturer would not be responsible for a broken arm suffered in the same accident.

The court does not disagree with the basic theory of the aforesaid quotation contained in *Larsen*, but finds it inapplicable, under New Jersey law, to the circumstances in this case.

As heretofore indicated, plaintiff's experts testified that Dr. Huddell's head struck the head restraint immediately after the rear-end impact; that as a direct result of the head restraint's defective design, he suffered the head injuries which led to his death; and that if the head restraint had not been defectively designed, he "definitely" would have survived. No medical testimony at all was presented by General Motors, nor did its experts contradict plaintiff's theory of causation. Instead, General Motors contended that Dr. Huddell's head did *not* strike the head restraint, rather the header, and that, in any event, the head restraint was not defective. Accepting the plaintiff's contentions of contact and defect, as the jury did, there was no testimony, medical or otherwise, contradicting plaintiff's competent proofs that death was a direct result of the automobile's defective condition.

The issue for the jury, therefore, was one solely of proximate cause: if the jury found the head restraint defective, was this defect a proximate cause of Dr. Huddell's death? E. g., Brandenburger v. Toyota Sales, U. S. A., Inc., 513 P.2d 268, 276 (Mont.1973), (car's roof falls off, decedent crushed after thrown through opening; question for jury was whether "defective design proximately contributed to the death"); Engberg v. Ford Motor Co., 205 N.W.2d 104 (S.D. 1973) (decedent thrown from car after seat belt failure; testimony that decedent would have survived if held within car sufficient to submit causation issue to jury); *see* May v. Portland Jeep, Inc., 265 Or. 307, 509 P.2d 24, 26–27 (1973) (all injuries submitted to jury on proximate cause charge.)

In Hill v. Macomber, 103 N.J.Super. 127, 246 A.2d 731 (App.Div.1968), plaintiffs were passengers in a car struck head-on by defendant Macomber; a few moments later, there followed another head-on impact into their stopped car by defendant Barry. Medical testimony attributed their resultant inju-

ries (and, in one case, death) to one or more severe impacts; plaintiffs themselves, because of their conditions, were unable to differentiate between the collisions. The Appellate Division affirmed a joint verdict against both tortfeasors based on a charge that each defendant would be liable " 'if his negligence was . . . a substantial factor in producing the, . . ., injuries'," 103 N.J. Super. at 136, 246 A.2d at 736:

"Although concurrent tortfeasors generally are not jointly and severally liable where their acts caused distinct and separate injuries, or where some reasonable means of apportioning the damages is evident, the negligent driver of the automobile in the successive impact has been held jointly and severally liable for all of plaintiff's injuries, if the injuries are 'indivisible' and the liability therefor cannot be allocated with reasonable certainty to the successive collisions. . . . In Restatement, Torts (2d ed. 1965), § 433A provides that damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm. That latter approach was not possible here in the light of the evidence before the jury. Section 433B provides that where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, *the burden of proof as to apportionment is upon each such actor*. The evidence here did not demonstrate any such capability of apportionment. Barry did not sustain the burden required of him." *Id*. at 136–37, 246 A.2d 736–37 (Emphasis added)

 In the instant case, however, it is not necessary to position "the burden of proof as to apportionment," inasmuch as the injury complained of, death, is incapable of apportionment. Death is a single, indivisible injury; it is not comprised of divisible parts. Restatement (Second) of Torts, § 433A, comment i; W. Prosser, Law of Torts, § 52 at 315 (4th ed. 1971). Plaintiff, therefore, had the burden of proving that the defective head restraint was a substantial factor in causing Dr. Huddell's death, and the court so charged. She did not, under New Jersey law, have the burden of proving an impossibility, the division of an indivisible injury. The contention of General Motors that it cannot be held liable for that "portion" of the injury which would have occurred even if the head restraint had not been defective, *i. e*., whiplash or prolonged headaches, cannot be accepted by the court. If, however, there be logic to this contention, it would clearly be General Motors' burden to demonstrate the possibility of such apportionment once plaintiff had proved her cause of action based upon death. General Motors produced no such testimony. *See* Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc., 53 N.J. 157, 165–67, 249 A.2d 382, 385, 387–8 (1968).

In sum, the court finds no error requiring a new trial in the interest of substantial justice. Fed.R.Civ.P. 61.

III. PLAINTIFF'S AND GENERAL MOTORS' MOTION FOR JUDGMENT N.O.V. AGAINST LEVIN AND S. KLEIN.

The operative facts of the accident were not in serious dispute. On a clear, dry day, on a straight unobstructed road, Levin drove his Chrysler directly into the rear of Dr. Huddell's stopped Nova at a speed estimated between 50 and 60 miles per hour, as a result of which acceleration forces were exerted upon Dr. Huddell driving his head into the protruding edge of the head restraint. The sole cause of death was the brain injuries received thereby.

The jury found, in answer to special interrogatories, that the negligence of

Levin was not a proximate cause of Dr. Huddell's death. In examining this "factual" finding, in connection with the motions of plaintiff and General Motors for judgment *n. o. v.* against Levin and his responsible employer, S. Klein, the court must give the benefit of every reasonable inference to defendants Levin and S. Klein. The jury's findings demonstrate that it accepted plaintiff's theory of recovery against General Motors, that, theoretically, it was not the rear-end impact that inflicted the fatal injury, but rather, the impact of Dr. Huddell's head with the defective head restraint. In other words, the jury determined that if the head restraint had not been defective, Dr. Huddell would have survived the collision with little or no injuries, as did Levin.

The jury's finding, however, does not necessarily insulate Levin and S. Klein from liability, because it cannot be said that Dr. Huddell's death would have resulted even if Levin had not been negligent. *Cf.* Restatement (Second) of Torts § 432(1). Obviously, the lethal effects of the head restraint could not have come into play absent the external forces exerted upon the Huddell vehicle as a result of Levin's negligence.

■■■■ The motions for judgment *n. o. v.*, therefore, raise a pure question of law: if a dangerous instrumentality causes death, can it be legally considered the sole proximate cause of death, where its forces were set in motion by the negligence of another defendant exerted milliseconds prior to fatal impact? [11] This issue must be determined under New Jersey law.

■■■■ As the court charged, proximate cause "is an efficient cause, one that naturally and necessarily sets the other causes in motion and without which the observed effect would not have followed." Proximate cause is defined as that cause which is a "substantial factor," although not necessarily the sole factor, in bringing about an injury. Mitchell v. Friedman, 11 N.J.Super. 344, 348, 78 A.2d 417, 419 (App.Div.1951). It need not be the "immediate" cause of injury:

> " 'Assuming that there is a direct, natural, and continuous sequence between an act and an injury, through which the force of the act operated without the interposition of separate force *other than such a force as the act itself might have set in motion*, the act can be accepted as the proximate cause of the injury without reference to its separation from the injury in point of time or distance.' "

Andreassen v. Esposito, 90 N.J.Super. 170, 173, 216 A.2d 607, 609 (App.Div. 1966) (Emphasis added) (*citing* Batts v. Joseph Newman, Inc., 3 N.J. 503, 510, 71 A.2d 121 (1950)) and quoting from 38 Am.Jur. § 55, p. 703; *see* Restatement (Second) of Torts, §§ 433, 439. Foreseeability of actual injury is not the test, except in that a tortfeasor must have been able to envision that some harm might occur from his wrongful conduct. Bacak v. Hogya, 4 N.J. 417, 73 A.2d 167 (1950); *see* Hoover v. Sackett, 221 Pa. Super. 447, 451–52, 292 A.2d 461, 463 (1972); Restatement (Second) of Torts, § 435, comment b.[12]

A strikingly analogous issue arose most recently before the New Jersey Supreme Court in Pappas v. Santiago, 66 N.J. 140, 329 A.2d 337 (1974). There, a two-car collision occurred at a right angle intersection; the passengers in the

11. Because the question is one of pure law, there is no conflict with the Seventh Amendment, which provides that "no fact tried by a jury, shall be otherwise reexamined in a Court . . . , than according to the rules of the common law." *See* Neely v. Martin K. Eby Constr. Co., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); Baltimore & Caroline Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79

L.Ed. 1636 (1935). *Cf.* Pappas v. Santiago, 66 N.J. 140, 329 A.2d 337 (1974).

12. The court does not view the prospect of injury from a rear-end impact to be such a highly extraordinary event as would nullify Levin's duty to Dr. Huddell. *Cf.* Caputzal v. Lindsay Co., 48 N.J. 69, 222 A.2d 513 (1966).

respective cars instituted suit against the operators of each vehicle. At the bifurcated trial of the liability issue, the trial court submitted interrogatories to the jury similar to those in the instant case. In response thereto, the jury determined that both operators were negligent but that the negligence of one (Mrs. Palmieri) was not a proximate cause of the accident. Upon appeal to the Appellate Division of the New Jersey Superior Court, it was held in an unreported opinion, "that the jury determination that even though both drivers were negligent, the negligence of Mrs. Palmieri was not a proximate cause of the accident, 'was a manifest denial or miscarriage of justice.'" 66 N.J. at 143, 329 A.2d at 338. Certification was granted by the Supreme Court, 65 N.J. 297, 321 A.2d 258 (1974). That court stated:

> "We do not know from the jury verdict just what negligent conduct or default it found Mrs. Palmieri to be guilty of, but *in the circumstances of this case we cannot conceive of any act or omission amounting to negligence on the part of Mrs. Palmieri in the operation of her car that would not have contributed causally to the happening of the accident. On this basis the jury verdict as to Mrs. Palmieri, finding negligence but absence of proximate cause, was patently inconsistent.*" 66 N.J. at 143, 329 A.2d at 339 (emphasis added).

To be borne in mind is that the circumstances in the instant rear-end collision between the speeding Levin vehicle and the stopped Huddell vehicle are so much stronger than the right angle, intersectional collision in the case of Pappas v. Santiago, *supra.*

Now, it may be urged that the jury determined Levin to be negligent; that if the interrogatory had been so phrased as to whether his negligence proximately contributed to the *accident,* it would have responded "Yes." However, the interrogatory was couched in language as to whether Levin's negligence causally contributed to Dr. Huddell's *death.* Apparently, the jury made a distinction between accident and death. It is, however, in the circumstances of this case, impossible for such a distinction to be made. The accident and death were indivisible. There can be no dispute that Levin's negligence caused the accident. Nor can there be any dispute that the forces created by the accident were in active operation at the time Dr. Huddell received the fatal injury to his brain, and that the lethal blow of the head restraint was actuated solely by the rear-end impact.[13] Therefore, Levin's negligence was a proximate cause of Dr. Huddell's death, and, as a matter of law, he and his employer must bear joint responsibility with General Motors for the plaintiff's injuries. *See* Restatement (Second) of Torts § 435, comment b.[14]

13. At oral argument, General Motors offered the following analogy, with which the court concurs. Suppose an S. Klein employee, cleaning a gun, negligently caused it to fire a bullet at the plaintiff wearing a "bulletproof" vest manufactured by General Motors. If the bullet passed through the vest because of a defect in its material, thus killing the plaintiff, could S. Klein reasonably argue that its employee's negligence was not a proximate cause of the death? The court does not believe that it could (nor, for that matter, could General Motors argue that the vest's defect was not a proximate cause of the death).

14. Because Levin's negligence created forces that were actively operating at the time of the fatal impact with the head restraint, it cannot be said that the defective head restraint was an "intervening" or "superceding" cause of the death. White v. Ellison Realty Corp., 5 N.J. 228, 234–35, 74 A.2d 401, 403–04 (1950); Batts v. Joseph Newman, Inc., 3 N.J. 503, 509–10, 71 A.2d 121, 124 (1950); *see* Schreffler v. Birdsboro Corp., 490 F.2d 1148, 1154 (3d Cir. 1974). Obviously, too, there can be no apportionment of damage as to Levin and S. Klein, not only because the injury is "indivisible," but because Levin's negligence directly precipitated the lethal impact with the head restraint. *Cf.* Restatement (Second) of Torts, §§ 450, 457, 461.

Defendants Levin and S. Klein argue further that judgment *n. o. v.* must nevertheless be denied because neither plaintiff nor General Motors moved, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, for a directed verdict as to Levin and through him, as to S. Klein. Under Rule 50, a necessary precondition to a motion for judgment *n. o. v.* is a motion for directed verdict at the close of the evidence, together with the presentation of the "specific grounds therefor." The purpose of this requirement is to alert the court and counsel to the movant's position and to give his opponent an opportunity to correct technical defects in his case. *E. g.,* Cortez v. Life Ins. Co. of North America, 408 F.2d 500, 503–04 (8th Cir. 1969).

In this case, General Motors' motion for a directed verdict dealt solely with plaintiff's claim against it; at no time did it indicate its desire that its cross-claim against Levin be decided as a matter of law. Nor did plaintiff move formally for a directed verdict. Plaintiff did, however, at the close of the evidence, submit the following request for charge:

"Under the evidence produced in this case, as a matter of law, defendant Levin was negligent. Therefore, I direct you to return a verdict against the defendant Levin and in favor of the plaintiff."

Considerable discussion concerning the requests for charge clearly indicated to the court and counsel plaintiff's contention that whatever the resolution of her claim against General Motors, Levin's negligence had to be a proximate cause of Dr. Huddell's death.

The Third Circuit's rulings on this procedural question are not entirely clear. In Psinakis v. Psinakis, 221 F.2d 418, 422 (3d Cir. 1955), the trial court treated plaintiff's "motion for binding instructions" as a viable substitute for a Rule 50 motion, and entered judgment *n. o. v.* in her favor. In subsequent cases, however, the court has indicated that a request for charge may not be sufficient; nevertheless, in each case, the court has examined the merits as the basis for its affirmance of trial court refusal to enter judgment *n. o. v.* Eisenberg v. Smith, 263 F.2d 827, 829 (3d Cir. 1959); Budge Mfg. Co. v. United States, 280 F.2d 414, 415–16 (3d Cir. 1960); Massaro v. United States Lines Co., 307 F.2d 299, 303 (3d Cir. 1962); Brandon v. Yale & Towne Mfg. Co., 342 F.2d 519, 520–21 (3d Cir. 1965) (en banc) (McLaughlin, J., dissenting; majority in affirming, discusses only merits). A review of these cases indicates not only the Third Circuit's desire that the trial judge be apprised of the movant's position through "substantial compliance" with Rule 50, *Budge, supra,* but also an overriding concern that technical noncompliance with Rule 50 should not be used as a basis for withholding relief when warranted:

"The rules of civil procedure are designed to assist civil business in an ordinary fashion but surely should not be so literally interpreted as to prevent a fair result in a meritorious case." Eisenberg v. Smith, *supra,* at 829.

Here, plaintiff's request for charge, submitted at the close of evidence, clearly made the trial judge and counsel aware of her position. The court, therefore, finds substantial compliance with Rule 50. *See e. g.,* Jack Cole Co. v. Hudson, 409 F.2d 188, 191 (5th Cir. 1969). Plaintiff's motion for judgment *n. o. v.* against Levin and S. Klein will be granted.

Even were plaintiff's request for charge deemed technically deficient, the court would nevertheless be required, in the interests of justice, to grant a new trial. Cowger v. Arnold, 460 F.2d 219, 222 (3d Cir. 1972) (following Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814, 817 (2d Cir. 1970)). In both *Cowger* and *Oliveras,* the courts ruled that judgment *n. o. v.* would have been required had a Rule 50 motion been

presented; inasmuch as such a motion had not been raised, the causes were remanded for new trials, each court noting that at such trial the defendant might be able to present sufficient additional exculpating evidence to create a jury issue. Here, however, the court cannot foresee that any additional evidence on causation can be offered; Levin's car struck the rear of the Huddell vehicle; and there is no other possible external cause of injury. Thus, were a new trial granted, the court might hear the same testimony all over again, but would be compelled to grant a directed verdict at the close of the evidence. Such useless expenditure of judicial time and energy should not flow from procedural rules designed to expedite proceedings.

 Although General Motors, unlike the plaintiff, presented no argument or pleading in substantial compliance with Rule 50, its cross-claim cannot be considered in a vacuum. If the court had properly granted plaintiff's request for charge, at least as to causation, that ruling would have inured to the benefit of General Motors. Additionally, the court does not believe, for the reasons stated above, that a new trial granted to General Motors under the authority of Cowger v. Arnold, *supra,* would in any way change the final result.[15] The court therefore grants General Motors' motion for judgment *n. o. v.,* limited to contribution.[16]

## IV. DEFENDANTS' MOTIONS FOR NEW TRIAL LIMITED TO DAMAGES

 General Motors has moved for a new trial on the issue of damages, in which S. Klein joins. They contend that the trial court erred (1) in admitting testimony concerning the potential

15. The court holds that, under any conceivable interpretation of the facts, the causation issue as to Levin and S. Klein should not have been submitted to the jury, but decided adversely to them as a matter of law. Should an appellate court subsequently find this ruling erroneous, this court would reinstate the jury's verdict, and deny the conditional motion for a new trial. Fed.R.Civ.P. 50(c).

16. The court does not agree with S. Klein's contention raised at oral argument that, because its defense and summation presupposed that causation would be a factual issue for the jury, it will suffer prejudice if judgment *n. o. v.* is granted. Since a Rule 50 motion could not have been presented by plaintiff or General Motors until the close of all the evidence, there could have been no reliance prior to that time. Indeed, both Levin and S. Klein extensively cross-examined plaintiff's damage witnesses and introduced documentary evidence dealing with damages. Levin's counsel argued the damage issues at length in his closing. While S. Klein's counsel did not directly address the damage issue in the closing, the court does not find that such exclusion was in justifiable reliance upon the failure of the plaintiff or General Motors to present a formal Rule 50 motion. Prior to the final summations, plaintiff's binding request for charge had been presented and the causation issues *discussed. The court had specifically ruled* that the issues of "intervening cause" and "apportionment" would not be submitted to the

jury. Nor could S. Klein have relied upon the court's failure to grant plaintiff's request for charge, at least as to causation. Were this the case, judgment *n. o. v.* could never be entered. A party, in determining its trial tactics, may not justifiably rely upon the correctness of a trial court ruling. Gore v. Northeast Airlines, Inc., 373 F.2d 717, 726–27 (2d Cir. 1967). Finally, in Pappas v. Santiago, *supra,* a bifurcated trial, the court determined that Mrs. Palmieri was bound by the verdict as to damages, even though she had been dismissed from the case prior to the separate damage trial and even though her counsel did not participate in any aspect of the damage case. The rationale offered was that Mrs. Palmieri should have known that there was a possibility of the verdict in her favor being overturned, and thus, even though exonerated from liability, should have taken measures to protect herself. Here, S. Klein has argued that, even though it participated in all aspects of the damage presentation, including the introduction of evidence, even though it knew that plaintiff opposed submission of her claim againt Levin to the jury, and even though S. Klein remained in the case until the jury's final verdict, it had a right to rely upon the court's decision to submit the case to the jury. If Mrs. Palmieri could not justifiably rely on her liability verdict *before* the damage trial, it seems clear that S. Klein *could not rely on the possibility of* exoneration *during* the damage trial.

growth of Dr. Huddell's earning capacity and (2) in denying defendants a credit for federal income taxes not assessed upon the award pursuant to Congressional exemption.[17]

In determining both questions, the court must divine what the New Jersey Supreme Court would rule if presented with the issue. Costello v. Schmidlin, *supra*.

## 1. GROWTH OF EARNING CAPACITY

Under New Jersey law, as is conceded by all parties, part of the damages, recoverable in wrongful death cases is the loss of monetary support during the projected period of dependency. Earning capacity is of paramount importance in determining this loss. *E. g.,* Frasier v. Public Serv. Interstate Transp. Co., 244 F.2d 668, 670 (2d Cir. 1957).

Defendants do not now challenge that portion of the court's charge permitting the jury to consider prospective change in the amount of Dr. Huddell's earning capacity.[18] Under New Jersey law, judicial notice is taken of changing economic trends, as well as of the deflated value of the dollar. *E. g.,* Clifford v. McCloskey, 13 N.J.Super. 96, 97–98, 80 A.2d 134, 135 (Law Div. 1951). A jury may therefore consider changing economic conditions as one of its guides in determining probable future loss. *See also* McStay v. Przychocki, 9 N.J.Super. 365, 74 A.2d 370 (Law Div.), aff'd, 10 N.J.Super. 455, 77 A.2d 276 (App.Div.1950); Frasier v. Public Serv. Interstate Co., *supra*. In death cases, the prospect of future increases in earnings may be the subject of evidentiary proof, Gluckauf v. Pine Lake Beach Club, Inc., 78 N.J.Super. 8, 187 A.2d 357 (App.Div.1963), or of judicial notice. Narsh v. Zirbser Bros., Inc., 111 N.J.Super. 203, 218, 268 A.2d 46, 54 (App.Div.1970) (reversing an $85,–000 award as inadequate because "it is inconceivable" that decedent's earnings would not have increased).

Because future growth of earnings is proper matter for the jury's consideration, expert testimony, based upon special knowledge or experience, may be introduced as an aid to the jury's determination. The admission and extent of such testimony is within the trial court's discretion. *E. g.,* DiNizio v. Burzynski, 81 N.J.Super. 267, 195 A.2d 470 (App.Div.1963).

Plaintiff offered the testimony of Professor Michael Wachter, a University of Pennsylvania economist specializing in relative earning capacities and future economic trends. In addition to teaching duties in his specialties, Pro-

17. The court notes, however, that none of the defendants challenges the award as "unconscionable," or even overly generous. With the exception of the growth rate and income tax issues, there is no challenge to the court's charge on damages or the jury's finding thereon. The verdict was well within the bounds of reasonableness.

The court has not considered General Motors' argument, based upon factual assertions in a post-trial *ex parte* affidavit, that a different discount rate should have been submitted to the jury in connection with its present worth calculations. Defendants had unfettered opportunity to present evidence at trial, and only the trial evidence can be considered. The *ex parte* affidavit is therefore ordered stricken from the record.

18. The court charged, in part: "No one can . . . predict what the future holds in store for any of us . . . . Economic conditions, such as depressions, recessions, booms, inflationary periods, and so forth, must . . . be borne in mind . . . . There is no absolutely fixed rule. You must be guided by your own understanding and by the exercise of good judgment and common sense. . . . [Y]ou may consider the present high cost of living, the fluctuating value of the dollar, as well as the growth rates of the costs of products, services, and Dr. Huddell's earnings. You have heard expert testimony concerning what an estimate of growth rate would be for the next 30 years. As with all testimony, it will be solely within your province whether to accept such testimony in whole or in part or reject it."

There was no objection to either the substance or wording of this charge.

fessor Wachter was consultant to the President's Cost of Living Council, advising on the impact of the program in relation to predicted economic trends; he also had studied and was continuing to study the inflation process under a National Sciences Foundation grant. As part of his work, he, along with other Wharton School professors, developed the Wharton Econometric Model, by which some 100 equations dealing with all pertinent economic variables are appropriately analyzed to forecast future economic trends over the short and long run. Professor Wachter's specific assignment was, and is, to develop and refine the wage and inflation equations used therein. The Model's resultant equations are utilized by both Government and industry. While past trends are only a part of this process of projection, the validity of the econometric model has been established by stimulating projections for past periods against known economic fact. On the basis of such past trends, together with generally accepted economic theory, Professor Wachter testified that a "very conservative" projection of the annual growth of Dr. Huddell's earnings, as a psychiatrist, over his work life expectancy would be six per cent. This average annual growth rate has occurred for the past 125 years, and is consistent with the projections of other sophisticated analyses, such as that of the Federal Reserve Bank. Exhibits, demonstrating the effect of this growth rate on all segments of the economy since 1947, including the earnings of physicians, were explained in detail to the jury.[19]

■ Defendants now argue that, while the jury was entitled to consider future growth of earning capacity, testimony based upon growth rates was inadmissible. Two recent Third Circuit opinions, interpreting Pennsylvania law, are cited in support of this proposition. Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (3d Cir. 1973) (2–1 decision), on remand, 374 F.Supp. 850 (M.D.Pa.1974); Magill v. Westinghouse Elec. Corp., 464 F.2d 294 (3d Cir. 1972). In both cases, the court held that the "expert" testimony offered was insufficient; and while both opinions expressed reservations about considerations of "inflation," the order of remand in each permitted introduction of appropriate evidence concerning potential growth of earning capacity.

Inasmuch as Pennsylvania courts, unlike those in New Jersey, have apparently not explicitly held that potential increases in earnings can be considered by the jury, these decisions may not be entirely applicable to this case. In context, however, they do present a valuable guide to trial judges in determining whether expert testimony concerning growth rates is admissible. In Magill, an actuary used an "earnings increase factor" in calculating future damages; the sole basis for his factor was the practice of accounting firms in planning pensions. The court, noting that the actuary was not an economist found that the earnings increase factor was therefore based upon "mere guess or speculation." Nevertheless, in remanding, it allowed the plaintiff to cure this defect:

> "Because there may be a *substantial factual basis* for use of an earnings increase factor, we do not foreclose the administrator from attempting, at the new trial, to establish that foundation and receiving a charge similar to that given at the original trial. We note, however, that the concepts of inflation and the declining value of the dollar have been almost universally rejected as providing support for the earnings increase factor." 464 F.2d at 301 (Emphasis added).

This court does not give the limited reading to this language that defendants

---

19. Although defendants presented no testimony concerning any of the damage issues, an exhibit used in their cross-examination of Professor Wachter was introduced. It showed an average yearly growth rate of psychiatrists' incomes of 7.4 per cent.

now offer. Had the Third Circuit determined that growth of earnings could not be considered, or that testimony about growth would be limited to "certain promotions or pay raises," certainly it could have so held. The court's apparent difficulty with the proof in *Magill* was that it was not based upon substantial fact; its cautionary language about inflation must be read in this light. The mere fact that "inflation" [20] has occurred in the past does not necessarily mean that it will continue in the future; such a conclusion can only flow from competent testimony by an economist qualified to project future economic trends.

In *Hoffman,* the court similarly held that testimony concerning future increases was without substantial factual basis. There, an economist based his calculations on testimony from two architects that earnings in the past five years had increased at a six per cent annual rate. Again, the Third Circuit struck such testimony, not because of its preclusion of the consideration of economic trends, but because of the lack of factual support:

> "[N]o *evidence* was introduced in the case at bar as to the probability or magnitude of future inflationary trends and there was no evidence projecting inflation over a long period of time. . . . [The economist] was only utilized, as was the expert witness in *Magill,* to perform the actuarial function of calculating present values. . . . Both the present

case and *Magill* are marked by the *total absence of any evidence of probable future salary trends or economic trends."* 485 F.2d at 144 (Emphasis added).

In short, both *Magill* and *Hoffman* hold that before a Pennsylvania jury can consider future increases of earnings, there must be competent evidence of "probable future salary trends or economic trends"; evidence that growth has occurred in the past is not alone sufficient for this purpose.[21]

Professor Wachter's testimony gave the jury substantial evidentiary support for an award of damages based upon future growth of earnings. A more highly qualified expert in this field could not have been produced. Nor does the court accept defendants' suggested distinction between "earnings increase factor" and "inflation." Where a plaintiff has a contract setting forth future salary increases, such would be admissible. But where extended disability or death is involved, future growth of earnings can only be projected within the framework of the economy as a whole. This would be especially true in the case of private physicians, where "promotions" as such do not exist; their earnings are dependent upon their patients' ability to pay, which, in turn, depends upon general economic growth.

## 2. DEDUCTION OF INCOME TAX SAVINGS

In determining loss of earning capacity, New Jersey courts have always

---

20. To an economist, "inflation" is the "percentage rate of increase in the price level." "Growth rate," as applied to wages, is not the same. It is made up of two factors. First, the increase of prices ("inflation") which requires a worker to earn more to keep the same standard of living; second, "real growth," representing a high standard of living (better appliances, food, housing, etc.). Professor Wachter's projection of 6 per cent growth rate was based upon long-range projections of annual 3 per cent increases in both prices and standard of living.

The court in *Magill* apparently uses "inflation" to include both concepts of economic growth.

21. The holding on remand of *Hoffman,* although not necessarily the reasoning, supports this conclusion. There, plaintiff merely offered to produce evidence of past trends over 20 years, rather than the 5 years rejected by the Third Circuit. 374 F.Supp. 850, 853 (M. D.Pa.1974); *accord,* Frankel v. United States, 321 F.Supp. 1331, 1345–46 (E.D.Pa. 1970), aff'd, 466 F.2d 1226 (3d Cir. 1972) (evidence of trends during past 10 years) (cited with approval by *Hoffman,* 485 F.2d at 144).

considered only the loss of gross income. Russell v. City of Wildwood, 428 F.2d 1176, 1179 (3d Cir. 1970); Budd v. Lackawanna R. R., 98 N.J.Super. 47, 59–60, 236 A.2d 143, 150 (1967); Narsh v. Zirbser Bros., 111 N.J.Super. 203, 268 A.2d 46 (App.Div.1970); McManus v. New Jersey Water Co., 22 N.J.Super. 253, 91 A.2d 868 (App.Div.1952); Moore v. Public Serv. Coord. Transp., 15 N.J.Super. 499, 509, 83 A.2d 725, 731 (App.Div.1951). Both this court and the Third Circuit have previously recognized New Jersey's gross income rule. Domeracki v. Humble Oil & Ref. Co., 443 F.2d 1245, 1250 (3d Cir. 1971) (citing New Jersey's holding that gross earnings, rather than net earnings after taxes, are to be considered in calculating loss of earning capacity); Caporossi v. Atlantic City, 220 F.Supp. 508, 525 (D.N.J.1963) (recognizing rule in refusing instruction on non-taxability of the award), aff'd, 328 F.2d 620 (3d Cir. 1964), cert denied, 379 U.S. 825, 85 S.Ct. 51, 13 L.Ed.2d 35 (1964). The New Jersey Supreme Court has indicated approval of this majority rule, but, while New Jersey courts continue to consider only gross earnings, its Supreme Court has yet to rule definitively on the question. Stopford v. Boonton Molding Co., 56 N.J. 169, 193, 265 A.2d 657, 670 (1967).

Defendants argue, in essence, that if the New Jersey Supreme Court were squarely confronted with the issue today, it would rule that income tax considerations must be injected into all tort actions. Specifically, they argue that an injured plaintiff is in a "better" position after a jury award of damages than he would have been had he not been injured, since the injured plaintiff does not have to pay taxes on that portion of his award representing lost income.[22]

Defendants' conclusion, however, does not necessarily follow from its premise. Congress could tax personal injury awards, in which case the defendants would pay the entire loss (as they do today) and plaintiffs would receive their entire loss (as they do today). The difference would be that, thereafter, plaintiffs would have to remit a portion of their award to the federal treasury. Thus, the question is not whether plaintiffs are "over-compensated," but which party to the litigation should receive the benefit of the exemption of personal injury awards from taxation.

In all but one state, the gross earnings rule is followed. In twenty-eight states, the question has been specifically considered. In twenty-seven of those states, the courts have ruled either that income tax consequences cannot be considered, or have accepted the majority rule that cautionary instructions should not be given concerning the non-taxability of the award.[23] Nor is there any

---

**22.** Alternatively, defendants submit that a different rule should be applied in wrongful death cases from that applicable in personal injury cases. The distinction is without substance. In both instances, defendants argue that the plaintiff is given more than "compensatory" damages. In personal injury cases, the plaintiff receives, as earnings, amounts that would otherwise have been paid as taxes; in wrongful death cases, the defendant's survivors receive amounts that would have otherwise been paid as taxes. The policy considerations, to be discussed, are the same in both instances: whether Congress intended the benefit of nontaxation to inure to innocent victims of tortious conduct or tortfeasors, and whether the evidentiary and legal complications inherent in determining prospective tax liabilities override any theoretical difficulties in passing such a Congressional benefit to plaintiffs.

**23.** Alaska: Runnels v. City of Douglas, 15 Alaska 221, 124 F.Supp. 657 (1954); Arizona: Mitchell v. Emblade, 80 Ariz. 398, 298 P.2d 1034 (1956); California: Henninger v. Southern Pac. Co., 250 Cal.App.2d 872, 879, 59 Cal.Rptr. 76, 81 (1967); Anderson v. United Air Lines, Inc., 183 F.Supp. 97 (S.D. Cal.1960) (death case); Delaware: Gushen v. Penn Central Transp. Co., 280 A.2d 708 (Del.1971); Abele v. Massi, 273 A.2d 260 (Del.1970); Florida: St. Johns River Term. Co. v. Vaden, 190 So.2d 40, 42 (Fla.App. 1966); Prudential Ins. Co. of America v. Wilkerson, 327 F.2d 997 (5th Cir. 1964); Georgia: Atlantic Coast Line R. R. v. Brown, 93 Ga.App. 805, 92 S.E.2d 874

case decided under "federal" law where the jury's consideration of income tax consequences has been permitted.[24] In non-jury cases decided under "federal" law there appears to be only two exceptions to the majority rule.[25] The only area where authority is evenly divided is Federal Tort Claims Act cases, where the United States as defendant is also the benefactor of the exemption.[26]

(1956) ; Hawaii: Kawamoto v. Yasutake, 49 Haw. 42, 410 P.2d 976 (1966) ; Illinois: Hall v. Chicago & N. W. Ry., 5 Ill.2d 135, 151–52, 125 N.E.2d 77, 85 (1955) ; Indiana: Highshew v. Kushto, 235 Ind. 505, 507–08, 134 N.E.2d 555, 556 (1956) ; Iowa: Combs v. Chicago, St. P., M. & O. Ry., 135 F.Supp. 750 (N.D.Iowa 1955) ; Kansas: Spencer v. Martin K. Eby Const. Co., 186 Kan. 345, 350–51, 350 P.2d 18, 25 (1960) ; Nichols v. Marshall, 486 F.2d 791, 794 (10th Cir. 1973) (death case) ; Kentucky: Louisville & N. R. R. v. Mattingly, 318 S.W.2d 844, 848 (Ky. 1958) ; Maryland: Rhone v. Fisher, 224 Md. 223, 225, 167 A.2d 773, 775 (1960) ; Plant v. Simmons Co., 321 F.Supp. 735, 739–40 (D.Md.1970) ; Michigan: Grant v. National Acme Co., 351 F.Supp. 972, 979 (W.D.Mich. 1972) ; Minnesota: Briggs v. Chicago G. W. Ry., 248 Minn. 418, 430–31, 80 N.W.2d 625, 636 (1957) ; Raycraft v. Duluth, M. & I. Ry., 472 F.2d 27, 23 (8th Cir. 1973) ; Missouri: Dempsey v. Thompson, 363 Mo. 339, 346, 251 S.W.2d 42, 45 (1952) ; Montana: Bracy v. Great Northern Ry., 136 Mont. 65, 74, 343 P.2d 848, 853 (1959) ; Ohio: Bergfeld v. New York, C. & St. L. R. R., 103 Ohio App. 87, 99–100, 144 N.E.2d 483, 492 (1956) (death case) ; Oklahoma: Chicago, Rock Island & P. R. R. v. Kinsey, 372 P.2d 863, 867–68 (Okl.1962) ; Pennsylvania: Girard Trust Corn Exch. Bank v. Philadelphia Transp. Co., 410 Pa. 530, 538, 190 A.2d 293 (1963) (death case) ; Tarter v. Souderton Motor Co., 257 F.Supp. 598, 602 (E.D.Pa.1966) (death case) ; Rhode Island: Oddo v. Cardi, 100 R.I. 578, 218 A.2d 373 (1966) (apparently not cited to the First Circuit in Turcotte v. Ford Motor Co., 494 F.2d 173 (1st Cir. 1974) (R.I. law)) ; Tennessee: Dixie Feed and Seed Co. v. Byrd, 52 Tenn.App. 619, 627–28, 376 S.W.2d 745, 749 (1963) ; Texas: Texas Consol. Transp. Co. v. Eubanks, 340 S.W.2d 830, 836 (Tex. Civ.App.1960) (death case) ; John F. Buckner & Sons v. Allen, 289 S.W.2d 387, 394 (Tex.Civ.App.1956) ; Virginia: Hoge v. Anderson, 200 Va. 364, 367–68, 106 S.E.2d 121, 123–24 (1958) ; Washington: Hinzman v. Palmanteer, 81 Wash.2d 327, 333–34, 501 P. 2d 1228, 1232–33 (1972) (death case) ; Wisconsin: Behringer v. State Farm Mut. Auto Ins. Co., 6 Wis.2d 595, 603–04, 95 N.W.2d 249, 254 (1959). *Contra,* Floyd v. Fruit Indus., Inc., 144 Conn. 659, 136 A.2d 918 (1957).

New Hampshire may also follow the majority rule. Boston & M. R. R. v. Talbert, 360 F.2d 286 (1st Cir. 1966) (taxes not deducted in case arising under law of N.H.).

24. Cases following the majority rule are: Blue v. Western Ry., 469 F.2d 487, 496 (5th Cir. 1972) (reversing jury verdict because taxes improperly deducted from damages) ; Greco v. Seaboard Coast Line R. R., 464 F.2d 496 (5th Cir. 1972) ; Cunningham v. Bay Drilling Co., 421 F.2d 1398 (5th Cir. 1970) ; Boston & M. R. R. v. Talbert, 360 F.2d 286 (1st Cir. 1966) (death case) ; McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34 (2d Cir. 1960) ; Chicago v. N. W. Ry. v. Curl, 178 F.2d 497, 502 (8th Cir. 1950) ; Nice v. Chesapeake & O. Ry., 305 F.Supp. 1167, 1180 (W.D.Mich.1969) ; Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243 (E.D.Va. 1963), aff'd, 333 F.2d 676 (4th Cir. 1964) (death case) ; *see* Payne v. Baltimore & O. R. R., 309 F.2d 546, 549–50 (6th Cir. 1962) ; Southern Pac. Co. v. Guthrie, 186 F.2d 926 (9th Cir. 1951) (en banc) (taxes too speculative to be used to judge excessiveness) (overruling *Southern Pac. Co.,* 180 F.2d 295 (9th Cir. 1950)).

25. Cases following the majority are: In re M/V Elaine Jones, 480 F.2d 11 (5th Cir. 1973) (death case) ; In re Marina Mercante Nicarguense, 364 F.2d 118, 125–26 (2d Cir. 1966) (death case) ; Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 313 (2d Cir. 1964) (death case) ; Ryan v. United States Lines Co., 303 F.2d 430 (2d Cir. 1962) (deduction of taxes on past losses only) ; Stokes v. United States, 144 F.2d 82, 87 (2d Cir. 1944) ; Higginbottom v. Mobil Oil Corp., 360 F.Supp. 1140, 1149 (W.D.La.1973) (death case) ; Nye v. A/S D/C Svendborg, 358 F.Supp. 145, 153 (S.D.N.Y.1973) (death case) ; Simpson v. Knut Knutsen, O.A.S., 296 F.Supp. 1308, 1312 (N.D.Cal.1969) (death case), modified, 444 F.2d 523 (9th Cir. 1971) ; In re Oskar Tiedemann & Co., 236 F.Supp. 895, 906–07 (D.Del.1964) (death case) (deduction of taxes on past losses only) ; *see* In re United States Steel Corp., 436 F.2d 1256, 1274 (6th Cir. 1970). *Contra,* Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967) (taxes are to be considered only for period beginning sixteen years after death) ; LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir. 1965) (deduction within trial court's discretion).

26. Following the majority rule: United States v. Becker, 378 F.2d 319 (9th Cir. 1967) (death case) ; Montellier v. United States,

The court is persuaded that the New Jersey Supreme Court, if directly confronted with the issue, would continue to adhere to the gross earnings rule, for three reasons: first, it has tacitly followed the rule and expressed its approval of it for the past fifty-six years (since the Congressional exemption of personal injury awards from income tax was first enacted); second, the Congressional exemption expresses a desire to give a benefit to victims of tortious conduct, a benefit that the New Jersey Supreme Court would not be inclined to shift to wrongdoing defendants; and third, the introduction of income tax consequences into jury trials would unduly complicate issues within the jury's true sphere of competence, liability and damages.

Although Congress may have initially excluded personal injury awards from taxation because of constitutional reservations, [27] it has since been clearly established that Congress can constitutionally tax any gain, and certainly that portion of a personal injury recovery representing lost income. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 430, 75 S.Ct. 473, 99 L.Ed. 483 (1955); H. Liebes & Co. v. Commissioner, 90 F.2d 932 (9th Cir. 1937); see Starrels v. Commissioner, 304 F.2d 574 (9th Cir. 1962); Agar v. Commissioner, 290 F.2d 283 (2d Cir. 1961). Nevertheless, Congress re-enacted the exemption in 1939 and 1954, as part of its comprehensive revision of the Internal Revenue Code; [28] the exemption remains unchanged today.[29]

The decision of Congress not to tax personal injury awards obviously results in a benefit equal to the amount of taxes that would otherwise be paid to the Government. If the defendants' argument is accepted, they will receive that benefit by being able to avoid payment of that portion of lost wages which would have otherwise been the plaintiff's responsibility to pay as income taxes. If the majority rule is accepted, injured plaintiffs will receive the benefit. The court can divine no societal purpose that would be furthered by awarding wrongdoing defendants with the benefit of this Congressional largesse. A societal purpose would be served by benefiting innocent victims of tortious conduct. Indeed, since the victims' chances of needing public relief are thereby diminished, this concern would be greater, not less, in the case of death, where the loss of earning capacity is total. This court therefore concludes that Congress, as with all exemptions under Section 104, ". . . intended to relieve a taxpayer who has the misfortune to become ill or injured . . .." Epmeier v. United States, 199 F.2d 508, 511 (7th Cir. 1952) *quoted with approval,* Haynes v. United States, 353 U.S. 81, 84, 77 S.Ct. 649, 1 L.Ed.2d 671 n. 3 (1957).[30]

315 F.2d 180 (2d Cir. 1963) (death case); Cincotta v. United States, 362 F.Supp. 386, 408 (D.Md.1973) (death case); Frankel v. United States, 321 F.Supp. 1331, 1348–49 (E.D.Pa.1970), aff'd, 466 F.2d 1226 (3d Cir. 1972); Christopher v. United States, 237 F. Supp. 787, 797 n. 3 (E.D.Pa.1965). *Contra,* Hartz v. United States, 415 F.2d 259 (5th Cir. 1969); Huggins v. United States, 302 F.Supp. 114, 118 (W.D.Mo.1969); Neff v. United States, 282 F.Supp. 910, 924 (D.D.C. 1968), rev'd on other grounds, 136 U.S.App. D.C. 273, 420 F.2d 115 (1969); Brooks v. United States, 273 F.Supp. 619, 632 (D.S.C. 1967); see United States v. Furumizo, 381 F. 2d 965 (9th Cir. 1967) (deduction discretionary with trial judge); United States v. Sommers, 351 F.2d 354 (10th Cir. 1965) (same).

27. The original exemption was enacted, without legislative history, after the Attorney General raised the issue whether personal injury awards were "income" within the meaning of the Sixteenth Amendment. 31 Ops. Att'y.Gen'l. 304, 308 (1918).

28. Int.Rev.Code of 1939, § 22(b)(5); Int. Rev.Code of 1954, § 104(a)(2).

29. The present statute, 26 U.S.C. § 104(a) (2), provides: "gross income does not include . . . (2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness."

30. Nearly two decades ago, as the income tax issue was beginning to be fully litigated, a commentator observed that the "continued presence of the exemption in the tax code

Moreover, the New Jersey Supreme Court would recognize the intended benefit of the Congressional exemption, under the "Collateral source" doctrine. Even though a plaintiff's monetary loss may be reduced by a relationship with a third party, the wrongdoing defendant cannot take advantage of that benefit. New Jersey law holds that "a wrongdoer cannot claim the benefit of the rights his victim may have against others by virtue of contract, employment, or other relation." Patusco v. Prince Macaroni, Inc., 50 N.J. 365, 368, 235 A.2d 465, 466 (1967). In other words, benefits received, whether "pursuant to contract or as a gratuity, cannot operate to reduce the damages recoverable against a tortfeasor." Rusk v. Jeffries, 110 N.J.L. 307, 311, 164 A. 313, 314 (E. & A.1933).

Several courts have recognized the logic of this argument in considering the income tax question. In one of the earliest cases to address itself to this issue, Chicago & N. W. Ry. v. Curl, 178 F.2d 497, 502 (8th Cir. 1950), the reasoning was apparently so obvious as to require only a blind cite to Majestic v. Louisville & N. R. R., 147 F.2d 621, 627 (6th Cir. 1945), which holds:

"The justice of the [collateral source] rule is that damages wrought by a wrongdoer are measured by the whole loss. The party injured is entitled to recover for all the loss inflicted and the wrongdoer may not take advantage of the contracts or other relation that may exist between injured persons and third persons."

Thus, it has been repeatedly said that the incidence of federal taxation on personal injury awards is a matter solely between plaintiff and the Government. E. g., St. Johns River Term. Co. v. Vaden, 190 So.2d 40, 42 (Fla.App.1966); Hinzman v. Palmanteer, 81 Wash.2d 327, 333–34, 501 P.2d 1228, 1232–33 (1972).[31] To base damages on after-tax earnings would nullify the very benefit Congress intended to bestow by granting the exclusion. E. g., Hall v. Chicago & N. W. Ry., 5 Ill. 2d 135, 151–52, 125 N.E.2d 77, 85 (1955); Dixie Feed & Seed Co. v. Byrd, 52 Tenn.App. 619, 627–28, 376 S.W.2d 745, 749 (1963).[32] The jury should be concerned only with plaintiff's total losses, not what might have happened to those earnings had he not been injured. See John F. Buckner & Sons v. Allen, 289 S.W.2d 387, 394 (Tex.Civ.App. 1956).[33]

appears to indicate that Congress intended to benefit injured persons by relieving them of the necessity of paying a tax." Note, 69 Harv.L.Rev. 1495, 1496 (1956). The observation is more conclusive today, given the twenty-year history of Congressional inaction in the face of clarifying opinions throughout the nation.

31. A different conclusion might be reached in Federal Tort Claims Act cases, because Congress, in waiving the Government's sovereign immunity, limited recoveries to damages purely compensatory in nature, to be determined only by a judge. See O'Connor v. United States, 269 F.2d 578, 584 (2d Cir. 1959). Therefore, it may be reasonable to suppose that in suits not between private parties, but between the plaintiff and the United States, Congress did not intend to extend the injured party a double benefit— the waiver of sovereign immunity and the exemption from taxes as well. Hartz v. United States, 415 F.2d 259, 264–65 (5th Cir. 1969); Neff v. United States, 282 F.

Supp. 910, 924 (D.D.C.1968), rev'd on other grounds, 420 F.2d 115 (D.C.Cir. 1969).

32. Both Hall and Byrd were cited with approval by the New Jersey Supreme Court in Stopford v. Boonton Molding Co., supra, 56 N.J. at 194, 265 A.2d at 670.

33. One commentator, generally critical of the collateral source rule, has recognized the doctrine's particular application to benefits created by legislation: "Whatever the logical difficulties of denying mitigation for collateral benefits in a system of damages which is primarily compensatory, Congress and the state legislatures may make a considered decision that particular benefits are to be additional to an injured party's other remedies. Where such legislative intent is ascertainable, mitigation is, of course, proper. Since 1939, the Internal Revenue Code may have reflected such a policy choice, damages recoverable for loss of earnings being expressly excluded from gross income." Note 77, Harv. L.Rev. 741, 752 (1964); accord, Note, 69 Harv.L.Rev. 1495, 1497 (1956) ("if the tax

This court does not believe that such a resolution is inequitable. It is clear that injured plaintiffs are now in a better position than they would be had Congress decided not to continue the exemption for that is the purpose of the legislation. *Cf.*, In re United States Steel Corp., 436 F.2d 1256, 1273 (6th Cir. 1970) (social security and insurance benefits); Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243, 245 (E. D.Va.1963), aff'd, 333 F.2d 676 (4th Cir. 1964) (survivors' benefits). But it cannot be said that injured plaintiffs are therefore "better off" than if they had not been injured at all. Especially in death cases, not all losses (such as loss of enjoyment of life, wounded feelings, etc.) are recoverable. In addition, because attorney's fees are not recoverable, any award, even if it represents the total losses, will be greatly reduced by the cost of litigation. *See* McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34, 38 (2d Cir. 1960); Greene v. Texeira, 505 P.2d 1169, 1177 (Haw.1973) (dissenting opinion in 2–2 decision reversing on other grounds).[34]

The court holds that Congress, continuing the exemption of personal injury awards from taxation in the face of almost unanimous agreement of the resultant benefit extended to plaintiffs, could not have intended its largesse to benefit wrongdoing defendants. The benefit is one extended to injured plaintiffs, and until Congress chooses to withdraw it, the New Jersey Supreme Court would not take it away.

An equally compelling reason for excluding the consideration of income tax consequences is that they are collateral to the true issues of the litigation, and would unduly confuse and complicate a jury trial.[35] There is certainly no speculation concerning the incidence of taxation, but the amount of tax which might be assessed against a given individual is a truly complex question. The number of possible exemptions, the type and amount of deductions, the effect of tax-exempt earnings, tax shelters and investment earnings, together with a host of other variables, make any realistic prediction impossible. Unlike economic growth, which is controlled by reasonably fixed principles of economic management, taxes are the creation of a political body, and therefore subject to change from session to session in Congress. Since the enactment of the Sixteenth Amendment, tax rates have changed an average of every three years, and more frequently in recent years. The tax advantage of professional corporations were not considered ten years ago. Tax shelters and permissible deductions are changed, created, modified, or eliminated literally with every Congress.

The difficulty of predicting the future of the tax code and its applicability to unknown individual decisions of a taxpayer is compounded by the confusion between the jury's traditional role as a fact-finder and the need to make legal determinations in considering tax consequences. For example, the jury

---

saving were deducted, the intent of Congress to confer a benefit upon the plaintiff would be subverted by shifting it to the defendant").

34. Indicative of the jury's thinking in this case was the following written question submitted to the court during the course of the jury's deliberations:

"The figure we come up [sic] does the lawyers fee come out of this figure?"

In response thereto, with the consent of all counsel, was the court's response:

"In your consideration of damages you should only consider those elements which were included in the charge of the court."

35. Cases adhering to the gross earnings rule have deemed these problems insurmountable. Gushen v. Penn Central Transp. Co., 280 A. 2d 708 (Del.1971); St. Johns River Term. Auth. v. Vaden, 190 So.2d 40, 42 (Fla.App. 1966); Combs v. Chicago, St. P., M. & O. Ry., 135 F.Supp. 750 (N.D.Iowa 1955); Dempsey v. Thompson, 363 Mo. 339, 346, 251 S.W.2d 42, 45 (1952); Dixie Feed & Seed Co. v. Byrd, 52 Tenn.App. 619, 627–28, 376 S.W.2d 745, 749 (1963); Hinzman v. Palmanteer, 81 Wash.2d 327, 333–34, 501 P.2d 1228, 1232–33 (1972).

would not only have to predict whether an individual would take advantage of certain tax shelters, the existence of which the jury would also have to predict, but would also have to determine whether the individual would be *legally* entitled to those shelters. Predictably, there would be legal disputes over such issues as the availability of professional corporation status, the amount and period of withholding income from taxation under retirement plans, the amount and type of legitimate business deductions, the availability of carry-backs, carry-forwards, and income-averaging, and the applicability of differing tax rates to different types of income. Most lawyers spend a full year in law school just to familiarize themselves with basic income tax law; state judges are never exposed to federal tax issues; and even federal judges are rarely exposed to such complicated tax problems.[36] The possibility of conflicting expert testimony extending the average trial by at least a day is not remote. Even then, the trial judge and counsel, much less a lay jury, could not realistically be expected to face this task with other than utmost confusion.

It is therefore not surprising that only one reported decision of the some one hundred cases, speaking to this issue, requires submission of the income tax issue to the jury. Not only would the complications inherent in income tax considerations impair and perhaps nullify the jury's true area of competence in determining disputed issues of fact, but it would pose a nearly impossible task upon the trial judge in articulating the tax considerations in a comprehensible jury charge. *E. g.*, Hartz v. United States, 415 F.2d 259, 264–65 (5th Cir. 1969); McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34, 37 (2d Cir. 1960); Tarter v. Souderton Motor Co.,

257 F.Supp. 598, 603 (E.D.Pa.1966); Highshew v. Kushto, 235 Ind. 505, 134 N.E.2d 555, 556 (1956).

In Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245 (3d Cir. 1971), the court was not confronted with the issue whether income tax considerations should be taken into account, since it found that none of the districts within its jurisdiction (Delaware, New Jersey, Pennsylvania, and the Virgin Islands), permitted such deductions. Nevertheless, in requiring that a jury be told of the non-taxability of the award (as was done in this case), it aptly set forth this court's concerns should the gross income rule be changed:

"We readily recognize the problems which could result from the introduction of income tax evidence. Shifting tax rates, together with other variables, could give rise to great conjecture, at least as to *in futuro* earnings. Indeed, the tax computation itself could completely overshadow the basic issues of liability and damages. . . . The [cautionary] instruction requested in this case would not require the introduction of any additional evidence. No reference to any IRS regulation or to any specific statute would be necessary. No tax expert would need be summoned as a witness. No tax tables would be hauled into the courtroom. No additional computation would be required. In brief, such an instruction would not open the trial to matters irrelevant to traditional issues in personal injury litigation, and thus would in no way complicate the case or confuse the jury." 443 F.2d at 1250–51.

For these reasons, this court cannot foresee any reasonable likelihood that

---

36. Even in non-jury cases, the problems inherent in dealing with income tax questions are substantial. Chief Judge Sheridan has noted that even with the aid of expert testimony "[u]nder our present complicated tax laws, the possibilities that a fact finder would have to consider defy imagination. A trial of a negligence action would, for the most part turn into a tax case, and a highly speculative one at that." Frankel v. United States, 321 F.Supp. 1331, 1348–49 (E.D.Pa.1970), affd, 466 F.2d 1226 (3d Cir. 1972).

the New Jersey Supreme Court would change its acceptane of the gross earnings rule if confronted with the issue today.

Defendants' motion for a new trial limited to damages is, in all respects, denied.

## V. PREJUDGMENT INTEREST AND COSTS

██ Under New Jersey law, the court charged the jury, without exception, that it could include within its award interest on *past* losses. Danskin v. Pennsylvania R. R., 83 N.J.L. 522, 530, 83 A. 1006 (E.&A.1912). Thereafter, pursuant to New Jersey Rule of Court 4:42–11(b), the court assessed interest on the entire award, at the prescribed annual rate of six per cent, from the date of the filing of the Complaint. General Motors now argues that, since the purpose of Rule 4:42–11(b) was to compensate plaintiffs for the loss of the use of monies during the period that litigation was pending, to assess interest twice (once by the jury and once by Rule of Court) would be unjust.[37] Plaintiff argues that the interest presumably awarded by the jury on past losses is part of the "award," and that she lost the use of that interest as well as the underlying principal; that the purpose of the jury's award is compensatory, and the purpose of Rule 4:42–11 (b) is to induce prompt settlement; and that if the Supreme Court had wanted to engraft an exception for wrongful death cases, it could have said so. The Supreme Court's reasoning in adopting the Rule could support either argument. Busik v. Levine, 63 N.J. 351, 358–74, 307 A.2d 571, 575–76 (1973).

It does not appear that the Supreme Court addressed itself to this unique problem in promulgating Rule 4:42–11 (b); had it done so, it is likely that the award of interest on past losses in death cases would have fallen within the same category as the discretionary assessment of interest in personal injury cases. Therefore, on balance, this court believes that interest on past losses should not be twice awarded, albeit that the theories justifying the award may be different in each instance. However, General Motors should not profit from its failure to call this problem to the court's attention at trial; had it done so, the court would have omitted its two-sentence charge on the award of interest for past losses, and added interest to the entire award after the jury's verdict. The court deems it just, therefore, to consider the sum of $100,000.00 as representing past losses,[38] and will deduct that sum from the remainder of the award, upon which interest will be assessed.

██ General Motors also objects to the assessment of certain costs relating to the mileage charges for plaintiff's principal witness and the cost of certain depositions. The assessment of these costs is within the discretion of the court. Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 147 (3d Cir. 1973); Mailer v. RKO Teleradio Pictures, Inc., 332 F.2d 747, 749 (2d Cir. 1964). Because the testimony of plaintiff's expert was critical to her case against General Motors, the mileage costs in excess of 100 miles will be permitted. The cost of those depositions, which were used at trial (whether by plaintiff or defendants on cross-examination),

37. Obviously, General Motors' argument would not apply to the jury's award of damages representing future losses, since no interest was added thereon by the jury. Rule 4:42–11(b) applies to all portions of the award, including future damages.

38. For want of a better guide, the court assumes that the jury's award included both past and future damages in the same ratio

as the past and future monetary losses to which plaintiff's expert testified. Based upon various assumptions, the expert placed past losses between $93,755.00 and $105,001.00, and future losses reduced to present worth between $1,348,706.00 and $2,443,565.00. The court further assumes that the jury did, in fact, award interest on the past losses.

will be similarly permitted; in addition, the cost of the depositions of General Motors' experts, which were vital to the proper preparation of plaintiff's case, will be permitted, even though General Motors, during trial, determined to call a previously undisclosed expert, rather than two of those who had been deposed. Plaintiff will submit an amended Bill of Costs itemizing the cost of depositions falling within this Order.

## VI. CONCLUSION

To accept the theory advanced by Levin and S. Klein that Levin, although unquestionably guilty of negligence but that such negligence was not a substantial factor of Dr. Huddell's death, or the theory urged by General Motors of divisible responsibility thereby imposing an impossible burden upon the plaintiff in the circumstances of this case, would leave an innocent victim without remedy. Such a determination is not in the best interest of substantial justice.

For all these reasons, the motions of defendant General Motors for judgment *n. o. v.* and new trial, as to its liability are denied; the motions of plaintiff and General Motors for judgment *n. o. v.* as to the liability of defendants Levin and S. Klein are granted; the motions of defendants General Motors and S. Klein as to damages are denied. The assessment of interest under Rule 4:42–11(b) and the assessment of costs are modified as noted.

An appropriate Order may be submitted.

## ADDENDUM

When this opinion was ready for distribution, the court discovered that the Seventh Circuit had recently addressed the rationale of Evans v. General Motors Corp., *supra*, in the case of Nanda v. Ford Motor Company, 509 F.2d 213, (7th Cir. 1974). The court in *Nanda* held that *Evans* was not controlling because the law of Illinois, rather than Indiana, governed. Erie v. Tompkins,

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Seventh Circuit then went on to affirm a decision of the district court which held that an automobile manufacturer had a duty to design and manufacture an automobile so that its occupants would not be subjected to an unreasonable risk of injury if a collision occurred. It is somewhat ironic that the Seventh Circuit now follows both *Evans* and *Larsen, supra*, although such a result is perfectly consistent under the *Erie* doctrine.

## SUPPLEMENTAL OPINION AND SUPERCEDING ORDER

Following the filing of a comprehensive opinion on February 25, 1975 disposing of all issues believed to have been presented at that time, in this negligence and products liability action, and the filing of an Order on April 2, 1975 in conformity with that opinion, the Court is presently confronted with several supplemental matters requiring disposition.

The defendant, George Gerson Levin, employee of the defendant, S. Klein Department Stores, Inc., and operator of his automobile which crashed into the rear of the decedent's Chevrolet Nova, manufactured by the defendant, General Motors Corporation, has moved for a new trial as to liability. The grounds urged in support thereof challenge only the Court's grant of judgment *n. o. v.* Inasmuch as none of these grounds, which have been fully briefed previously, request the Court to exercise its discretion in reviewing a motion for a new trial, the Court finds that nothing has been presented by Levin warranting the grant of his requested relief. Levin's motion for a new trial as to liability therefore, shall be denied.

Levin has also moved for a new trial as to damages on the ground of excessiveness, resting his argument on briefs previously filed with this Court which contained no contention that the verdict was not fully justified by the evidence. The Court ruled that the verdict was

well within the bounds of reasonableness. *See* Opinion at 81 n. 17. Levin's motion for a new trial as to damages, therefore, shall be denied.

The defendant, S. Klein, in addition to the refiling of its motion for a new trial as to damages, renews its motion for judgment *n. o. v.* and repeats its apparently abandoned motion for a new trial as to liability. In its post-trial memorandum to this Court, S. Klein stated:

"From a review of this record it is apparent that there is sufficient evidence upon which the jury based its finding that George Gerson Levin was in the scope of his employment with Klein at the time of the accident. Hence, that motion of Judgment N.O. V. is withdrawn" (S. Klein's post-trial brief at p. 28).

The Court deems the foregoing to be a judicial admission binding upon the defendant S. Klein. Moreover, the evidence amply supported the jury's verdict. Accordingly, S. Klein's motion for judgment *n. o. v.* shall be denied.

■ In sole support of its motion for a new trial as to liability, S. Klein alleges that the Court erroneously admitted into evidence portions of Levin's deposition relating to the agency issue. No error is here found. Fed.R.Civ.P. 32(a)(2). In any event, Levin did testify extensively on the agency issue and S. Klein has admitted that there was sufficient evidence upon which the jury could base its finding. Thus, if there was any error, it was harmless. Fed.R. Civ.P. 61. Therefore, S. Klein's motion for a new trial as to liability shall be denied.

All three defendants, Levin, S. Klein and General Motors move to strike the entry of prejudgment interest, urging that such is improper in a New Jersey case, under New Jersey law, tried in a federal court.

On December 21, 1971 the New Jersey Supreme Court adopted Rule 4:42–11(b), which authorizes prejudgment interest in all tort actions. As amended, the Rule specifically provides that "[T]he court shall, in tort actions, including products liability actions, include in the judgment interest at 8% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later." In Busik v. Levine, 63 N.J. 351, 307 A.2d 571 (1973), appeal dismissed for want of federal question, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973), the New Jersey Supreme Court declared this Rule to be of retrospective application, covering cases in which the tort occurred before the Rule was adopted but did not come to trial until after the effective date thereof.

■ The judgment entered on April 2, 1975 erroneously set the rate of interest at 6 per cent per annum. Rule 4:42–11(b) was amended, effective April 1, 1975, to provide for interest at a rate of 8 per cent per annum. Since the judgment was rendered after the effective date of the amendment, the higher rate is clearly applicable here. Hill v. Newman, 126 N.J.Super. 557, 316 A. 2d 8 (App.Div.1973), certif. denied, 64 N.J. 508, 317 A.2d 720 (1974); Riley v. Savary, 120 N.J.Super. 331, 293 A.2d 744 (Law Div.1972).

The applicability of the New Jersey prejudgment interest rule to actions in federal court has been challenged. In Glick v. White Motor Company, 458 F.2d 1287 (3d Cir. 1972), the Third Circuit affirmed the District Court's application of the Michigan prejudgment interest statute in a diversity action based on tort. In light of *Glick,* this court considers itself bound to apply the New Jersey prejudgment interest rule.

■ Under the principles enunciated in Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), Byrd v. Ridge Rural Elec. Co-Op. Inc., 356 U.S. 525, 78 S.Ct.

**94**

893, 2 L.Ed.2d 953 (1958) and Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), federal courts must apply the applicable state substantive law where jurisdiction is based solely upon diversity of citizenship of the parties. *See also* Woodmont, Inc. v. Daniels, 290 F.2d 186, 187 (10th Cir. 1961); Glens Falls Ins. Co. v. Danville Motors, 333 F.2d 187, 191 (6th Cir. (1964); Texaco, Inc. v. Lirette, 410 F.2d 1064, 1067 (5th Cir. 1969). Although various exceptions to this general rule have been carved out, for example, where the particular issue substantially affects the distribution of trial functions between judge and jury, *see Byrd, supra,* or where the issue is specifically covered by the Federal Rules or federal law, *see Hanna, supra,* none of which are applicable here, the underlying philosophy of *Erie* still prevails: that where rights or remedies of the parties are concerned, it is the applicable state law which is controlling.

In Busik v. Levine, *supra,* former Chief Justice Weintraub conducted an in depth analysis of the New Jersey Supreme Court's rule-making power and the nature and effect of its prejudgment interest rule. That court concluded that prejudgment interest is "compensatory as to the parties and represents 'damages' for delay in payment." 63 N.J. at 366, 307 A.2d at 580. The Court also cited Restatement (Second) of Conflict of Laws (1971), § 171, comment c, which classifies prejudgment interest in the same category as any other element of damages for purposes of applying the damage law of a given state to a conflict of law situation. *Id.*

Thus, the New Jersey Supreme Court has clearly declared its view that prejudgment interest is an integral element of damages in New Jersey tort and products liability actions. Therefore, under the *Erie* doctrine, a federal court must apply prejudgment interest to any award in a diversity case where New Jersey substantive law as to damages is applicable.

The defendants' applications to strike the entry of prejudgment interest shall be denied.

Finally, as contained in the original Order, the cross-claimant, S. Klein, is entitled to the entry of judgment in its favor and against the cross-claimee, Levin.